137078. Once again, we need to get past jurisdictional arguments before we get to the merits. Do I understand, Mr. West, that you want to reserve five minutes for rebuttal? Yes, ma'am.  May it please the Court, opposing counsel, my name is Travis West, as Judge O'Malley just said, and I have the pleasure of representing Mr. Frank Smith, who is a veteran of the United States Marine Corps. As Justice O'Malley just mentioned, there has been a jurisdictional issue that has been raised by the government in this case, as is common in most VA cases, and our understanding is that hinges largely, at least in the government's argument, upon whether my client is attempting to make an end-around on a factual dispute, or whether there's an illegal argument at issue with respect to whether the court below failed to appropriately grant deference to the interpretation of those two issues, really. First, did the court below fail to apply a binding rule upon the VA as set forth in the manual and in the training letter that are referenced in the briefs? And second, did the court below fail to defer to the VA's own interpretation of the regulations that apply to the VA as set forth in 38 CFR section 4.85? Did either the board or the Veterans Court explicitly interpret 4.85? No, they didn't, Your Honor, and that's exactly the point that's made probably most specifically in the reply brief, but certainly also in the opening brief, as well as in the motion for reconsideration that was summarily denied and is part of the record in the Jones Appendix. But if you did not have the handbook or training letter, there's nothing in 4.85 itself that seems to indicate that anything was done inadequately in this particular case. Is that right? I think that dives into the substantive versus interpretive argument that the government has raised in its brief, but I think you're correct. If you didn't have access to the training letter and the handbook, it would be difficult to know whether the VA had either interpreted its regulations in a particular way to which the court below should have granted deference or if the VA had created a binding rule, which we have argued. Well, how does the handbook have regulatory forms? The analysis is set forth... I read your analysis. Excuse me? I read your analysis. So the VA has essentially argued that it's a housekeeping rule and it just tells the physicians how to administer the examinations. And while we agree in part, and if that were all it did, then it would be a housekeeping rule and then perhaps is more appropriately addressed under our interpretive argument. But the handbook goes far beyond that. The regulation, as discussed in both our brief as well as in the government's brief, says basically two things. Well, two and a half things. One is that the exam must be administered by somebody who is licensed within the state where the exam takes place. And there's two exceptions to that because there are two states that don't have licensing. But in general, that's the first rule. The second step is that the physician must administer two particular exams, the PTAE and the Maryland CNC test. But where does it say in those... I mean, you could just view that as sort of manuals that say this is the way we, in the best of all worlds, we'd like you to do this. So where does that say that those become binding interpretations of the regulation, which does not contain those requirements on its face? Well, that goes to the crux of the matter. And this is an issue that was addressed in the Smith v. Nicholson... Excuse me. It's the Guerrero v. Shinseki case that's cited in our brief. And that case also references, although not binding, certainly persuasive here, the Fugere, which I'm mispronouncing, that F-U-G-E-R-E v. Drewinsky case, which was decided at the Veterans Court level. In those cases, what the court had said is that there are manuals that the VA has, internal manuals. And in that case in particular, they were referencing the VA's adjudication procedural manual M21-1, in which even though those manuals may or may not have been adopted under the procedures of the APA or may or may not have been amended under the appropriate procedures, in other words, either there was or wasn't notice granted and an opportunity to comment, because those rules have a substantive element to them that goes beyond what the CFR says, they are substantive in nature. How do you deal with Hamlet? I'm sorry, Your Honor. I guess I don't have a particular response to Hamlet. Okay. The point that I was attempting to address, Your Honor, is that the manual in question here, the handbook that we're referring to, has additional requirements that it's telling the physicians that it must perform that go beyond the simple requirements of having somebody licensed and conducting two particular tests. And the manual, in fact, lays out the reasons for that. One is in particular that there could be all sorts of reasons behind why a veteran may display non-organic results on his examination. In other words, results that could appear to be the consequence of malingering, but could also be a consequence of psychogenic problems, structural problems within the ear, and things that couldn't necessarily be determined just based on the two tests that are specifically discussed within 38 CFR 4.85. So our understanding is that there's a reason behind that, and that is because there's been case law and other regulations over time that have instructed the VA that it has an obligation to assist in this non-adversarial system, that it's possible that the veteran, which veterans who are largely unrepresented, as was the case here, may not be aware of the reasons for why they are experiencing particular symptoms and may not appropriately identify the cause of the symptoms that they are complaining of and that they believe constitute their service-connected disabilities. But even if the manual does suggest that certain activities may be done or even in the best of circumstances should be done, there's nothing in the manual that says that tests need to be repeated or additional tests need to be done when the claimant or the patient is being uncooperative. And to an extent, that gets to what our due process argument was in this case. I understand from a legal standpoint, we're not to get into the facts with respect to the... I mean, I'm having a real trouble with your due process argument. They sent him back about four times. I mean, how much process can they give him? The difficulty here, Your Honor, is that we can see that there is a system that is set up here that is supposed to account for people like Mr. Smith who have trouble, who are displaying symptoms or complaining of symptoms that may indicate to an untrained person that they have a hearing problem but that don't produce results that are consistent with that, that they produce inorganic results when they conduct the examinations. Mr. June, who is the examiner that did his examination in 2008, followed the protocol that is set up within the manual and accounted for that. He went through the additional tests that were talked about within the manual and he wrote up a report and explained why his conclusion was that Mr. Smith's non-cooperative behavior was likely not indicative of his hearing loss but indicative of something else, perhaps malingering. That would have been the appropriate steps for Ms. Gadboy, who was the examiner in 2010, to take as well. The problem is, because she didn't take those steps, the VA, the regional office, and its SSOC, the BVA, when it reviewed this, and then again the Veterans Court, all leads to a conclusion that there was malingering that was going on in 2010. In fairness, she said that she called his name. He got up and she said it softly. She said it softly. He got up, followed her, she gave him the instructions, and then all of a sudden he gets on the test and she turns it up to the highest possible volume and he says, I don't hear anything. Her job is to figure out if somebody can hear and if you can apply all the objective tests that you want but if the individual is not either being cooperative or apparently not truthful, those tests become meaningless. And that, we think, is the reason why the VA went beyond what their requirements were in 4.85 and instructed the physicians to do the additional testing because, and this is not obviously in the factual record because Mr. Smith wasn't represented well and perhaps had we represented, we may have done things differently, but there are certainly circumstances when people with hearing disabilities are able to read lips, for example. There are certainly circumstances in which people with hearing disabilities can hear voices or sounds that are at one frequency and not at another frequency. And it's our contention that the VA tried to account for that by creating these additional requirements with respect to what a physician should do when they undertake to test somebody for a hearing loss. Your factual discussion for the last couple of minutes segued away from the question about due process, which was raised by Judge O'Malley. So I'm going to give you another chance to respond to a case and that is, how do you respond to Helper v. West on due process? Your Honor, I think that the way that we respond to it is by simply moving back to Cushman and pointing out that this is not an instance where we're arguing that the rules that were in place weren't adequate to protect Mr. Smith's rights and weren't adequate to give him a fair shake. The problem that we have here is that nobody followed the rules. You've got the VA who promulgated the rules in both CFR 4.85 and in the handbook. But Helper says, to the extent petitioners simply put a due process label on his contention that he should have prevailed on his claim, his claim is constitutional in name only. Your Honor, you're going back to facts. Your Honor, I'm not trying to say, and perhaps I've done this inarticulate over the last minute or so, I'm not trying to say that the result would have been different if the VA, excuse me, if the Veterans Court had undertaken the appropriate analysis. Our contention is simply that they didn't bother to undertake it at all. There's nothing in Judge Castle's letter that says, you know, he looked at what the handbook said and he determined that it's not substantive and therefore Mr. Smith's argument at the Veterans Court was incorrect and it doesn't need to be applied. Or that he looked at the handbook and determined that it isn't substantive but it's interpreted and because we at the Veterans Court are required under Smith v. Nicholson and Auer v. Robbins to defer to the agency's interpretations of its own rules, we therefore need to analyze whether that interpretation is correct here. In other words, Judge Castle and, not to unfairly cast aspersions at the Veterans Court and the VA before him didn't undertake the analysis at all and didn't go through the process. And so that is the substance of our due process argument. Not that the result would have been different but that they were at least required to undertake the process that's been set up by the system that took place. I see I'm over time so thank you. Okay. Thank you. Good morning, Your Honor. To start off with jurisdiction, this is not, as the Court noted, there is nothing in the Veterans Court opinion or the Board's decision that is explicitly interpreting Section 4.85. But I have a little bit of a problem with that argument because it's true that there is a regulation. Correct. And that specifically addresses the circumstances of these types of tests, correct? That's correct, Your Honor. All right. So to the extent that there is an argument that the Veteran is arguing that that regulation has actually been interpreted by the VA through its manual and its handbook, whether you agree with that proposition or not. But to the extent that he's making that argument, the fact that the Board and the Court don't bother to mention that regulation, that interpretation, doesn't change the fact that he's arguing that that's where they made an error of law was that they didn't follow that regulation. It's sort of a situation where there's an implicit sort of interpretation, Your Honor. We don't believe that this is the same situation as that. This is a situation where Mr. Smith is arguing that there's been a failure to apply the handbook, which he finds to be interpretive. A failure to apply law to fact, again, does not fall within this Court's jurisdiction under 7292d-2b. So it wouldn't be an implicit interpretation. He's saying they violated the regulation. And the mere fact that the Board and the Court don't mention it, I mean, could they just excise us from all jurisdiction if they just don't bother to address the legal governing standards? Well, it's not that there was, I guess it's the failure to apply it, Your Honor, as opposed to bringing in a different interpretation of Section 4.85. If the Court had said something along the lines of, don't go in this path, go in another path, that would be an interpretation, even if they don't explicitly mention 4.85. Here, the Court did not apply the handbook whatsoever. And in doing so, certainly the VA didn't comply with it. And under Mr. Smith's argument, we disagree that there was no compliance with the handbook. We believe the facts show that there was. But can I just ask, I mean, you're drawing a line here. Well, our statute draws a line between application of law to facts, which we don't get to talk about outside the constitutional context, and legal interpretation. And we have something that seems to me at least presents a question about which side of that line this thing is on. And this thing here is failure to apply, not the actual application. We don't get to question the application, but why isn't a Veterans Court failure to apply, let's say, a regulation? In fact, an implicit interpretation that that regulation isn't here, I guess the question would be for the handbook, isn't a binding standard. Right, Your Honor. I will get to how we don't believe the handbook is binding to begin with. But to say that the failure to apply is somehow different than any other application would be drawing a line to the whole regulation as opposed to a portion of it, for instance. If a regulation had five parts and one was applied but not the other four, would there be jurisdiction in that situation?  So the failure to apply it would still be, excuse me, the ignoring of it would still be not applying even though it's not applying to the whole. Well, assuming we don't buy your jurisdictional argument, let's move on to what the regulation really says. And so what is your response to the contention that the regulation has been interpreted by the VA itself through its training manuals, through the handbook and the training letter? Well, we don't believe that there's been any analysis of the handbook underneath HAMLET. Four factors in the HAMLET to ensure that a regulation is actually binding upon the agency have not been analyzed by Mr. Smith. There is no intent in the record shown whatsoever for the VA to actually have this handbook be binding upon it. There's no evidence whatsoever that proper procedures were followed in enacting this handbook. Rather, if you take a look at the handbook, it is written by four doctors. It mentions in the first page of it that it's intended to provide guidance, best practices, to the actual audiologist. This is not a substantive document but rather an instruction manual to the VA's audiologists who are going to perform these tasks. But why isn't that something that, obviously the VA delegated to these doctors the at least task of establishing the practices that should be followed. Why isn't that the VA effectively interpreting their obligations under the regulation? Well, I do want to again point out that we do believe that it was followed ultimately on the merits. But in this situation, the instructions that are being received by the audiologist are not substantive in nature. If we look at the Paralyzed Veterans of America case, First West, a substantive rule is one that affects a change in existing laws or policy or affects individuals' rights or obligations. There's nothing about the manual that shows that that is actually what the document does whatsoever. What Mr. Smith is doing is attempting to use this manual, I guess, as a sword as opposed to the normal deference we see in the SHIELD situation with agency interpretations. So it's quite a different story than deferring to an agency's informal interpretation. Well, but if an agency, I mean, if we're going to defer to an agency's interpretation, if the agency's interpretation is to give itself additional obligations, we should defer to that too, right? I mean, we don't just defer when the agency says we don't have to do something. I'm sorry, Your Honor, could you please? You're saying that we shouldn't defer because the agency is not protecting itself with its interpretation. It's actually giving itself additional obligations. That doesn't seem to make sense. We either defer or we don't. Well, I don't think this is a question of deference, Your Honor. This is a question of whether or not Mr. Smith has a substantive right to something. Section 4.85 is unambiguous in its plain language. It requires three things. It requires that a state-licensed audiologist perform the test. It requires a pure tonal test, and it requires the Maryland C&C speech discrimination test. These are the three things that it requires. It's plain and unambiguous. There's no need for an interpretation. What Mr. Smith is attempting to do is bring an instruction manual out to create an additional obligation, a new must in that 4.85 that simply doesn't exist. It's not an interpretation. It's not deference to VA's interpretation. It's rather a new substantive right. And why do you argue on the fact that even if it did add substantive rights that they were satisfied? Well, the handbook, this is a situation where the VA attempted to follow the handbook, and the record shows this. What Mr. Smith is doing is parsing out the handbook, and rather it must be read as a whole. He states on JA 151 that the examiner must, and I'll quote JA 151 here, must report the results of all tests administered during the examination. However, this ignores on JA 154 the exact situation of Mr. Smith's case when there is no cooperation on the part of the veteran. The manual says, if test results are not reliable for rating purposes, the examiner should annotate the exam with the following statement. This exam is not adequate for rating purposes. In such circumstances, audiometric thresholds should not be reported. So the handbook specifically addresses the situation that Mr. Smith was in, a lack of cooperation. The manual must be read together, and in this specific instance, it was followed. Mr. Smith did not cooperate. His test results were not reported. So there has been a following of the manual itself, Your Honor. Mr. Smith says that there is a requirement to have a number of additional tests performed. There is no such requirement in the manual on JA 154, which is the page that Mr. Smith cites. Rather, that section points out when there is inorganic hearing loss, the test results should be reported. I just want to clarify that there are three types of situations we're talking about here, and it's on page 14 of the blue brief. Hearing loss due to an injury, hearing loss due to a psychological issue, inorganic hearing loss, and lack of cooperation. So we're falling into the third category, which the manual specifically addresses on JA 154, and it was followed. But malingering, a bad word you're not supposed to use. It's a word I'm trying to avoid. Just quickly regarding the due process issues here, Your Honor, we believe this case falls squarely within Guillory, if I'm pronouncing that correctly, 603 F. 3rd at 987. There are statutes and regulations set up for this process. Mr. Smith, from the fact that he's here today, has gone through that. He was at an exam. He went to the board. Can I just ask you about that? Can you tell, I'm not sure, I couldn't at least on my quick reading, is that little section of Guillory that says there's no due process, I forget what it was, problem issue, something like that, I don't think that was written as a jurisdictional point, but rather as a rejection of due process claim on the merits. I believe that's accurate, Your Honor. I'm remembering that correctly. There's just one paragraph at the end of the case, and it's just addressing it. Our jurisdictional argument on due process really hinges on the fact that we see no genuine constitutional issue here, that the issue is merely labeled under Helfer as a constitutional issue, and that's the basis of our motion to dismiss for that section of it. Guillory does really apply to the factual and merits determination that there is no due process violation in this case. If the Court has no further questions, we respectfully request that we confirm the decision of Veterans Court. Thank you. Mr. West, do you have a minute and a half? Thank you, Your Honor. I only have one thing that I wanted to point out real quick, and then I will yield to any questions. We agree with the government that the training manual must be read as a whole and take issue with the fact that the government has only cited its own particular sections of the manual to support its brief and is choosing to ignore, for example, on page 154 of the Joint Appendix, which counsel just cited that the paragraph immediately preceding the section that he quoted states, and I quote, it is not sufficient to merely detect the non-presence of non-organic hearing. Repeated attempts must be made to determine true organic thresholds, excuse me, hearing thresholds and speech recognition. If the repeated attempts to obtain the true organic thresholds or speech recognition are not successful, and then it goes on to explain the processes that the chief must apply or the equivalent person must apply. That same section, excuse me, similar language to this section also exists earlier in the manual on page 141 at the very top of the page. So my point being is that the manual does actually, as Mr. Smith has argued, prescribe that when non-organic results are detected, as was evidenced in Mr. Smith's examination reports, that there is some obligation to go on and conduct additional testing, as Mr. June did in 2007 and 2008. Thank you. Thank the court for its time.